UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Shannon Hunt, individually and on behalf of all others similarly situated, | 1:22-cv-04742 |
| Plaintiff, | |
| - against - | Class Action Complaint |
| Greenbrier International, Inc., | Jury Trial Demanded |
| Defendant | |

Plaintiff alleges upon information and belief, except for allegations pertaining to Plaintiff, which are based on personal knowledge:

1. Greenbrier International, Inc. ("Defendant") manufactures, markets, labels and sells "Maximum Strength" adhesive patches promising to deliver 4% lidocaine for eight hours under the Assured brand ("Product").



2. The front label identifies it as a "Pain Relief Gel Patch" with "Lidocaine 4%," to be used "For fast relief of minor aches and pains in: Back, Neck, Shoulders, Elbows [and] Knees."

3. The label promises "Temporary Relief" and "Numbing relief" for eight hours, shown by the clock image and text, "Apply For 8 Hours" next to a patch applied to a lower back from which red is emanated, indicating the purported relief provided.

I. **PRODUCT FAILS TO DELIVER LIDOCAINE IN PROMISED WAY**

4. Lidocaine is a topical anesthetic used to treat pain by blocking the transmission of pain signals from nerve endings in the skin to the spinal cord and brain.

5. Although lidocaine patches can be prescribed by doctors, they are available to consumers as an over-the-counter ("OTC") product.

6. In 2003, the Food and Drug Administration ("FDA") initiated rulemaking to classify products which delivered lidocaine through the skin in a patch form.

7. This was because there was no data on "[t]he safe and effective concentration" of lidocaine in this format, and uncertainties regarding the frequency of application that is considered safe and effective.

8. However, the FDA concluded that transdermal drug delivery systems, such as the patches used in the Product, systematically fail to adhere to the body.

9. The FDA Adverse Events Reporting System reports that approximately 70% of concerns stemming from lidocaine patches involve their poor adhesion.

10. A 2021 peer-reviewed study in the Journal of Pain Research found that approximately half of lidocaine patches promising adhesion for eight hours failed to completely adhere to the participant's skin for the entire time.

11. The study required that users be sedentary while the patches were applied, as they

are prone to much greater detachment when engaging in regular activities such as walking, stretching, and sleeping.

12. However, lidocaine patch technology exists which can maintain adhesion for at least eight hours under regular conditions.

13. Although the study only tested certain lidocaine patches, upon information and belief, Defendant's Product has not undergone rigorous FDA approval and uses the same outdated and defective adhesion technology as the lidocaine patches studied.

14. The message that the wearer can "Apply [the Product] For 8 Hours" of "Temporary Relief" is misleading because it regularly peels off skin within three to four hours, and sometimes in minutes, after being applied.

15. Consumers expect that when they are told to "Apply [the Product] For 8 Hours," it will adhere to their bodies for no less than eight hours or even longer.

16. The Directions confirm the Product will adhere to the user's skin for eight hours because it instructs to "Remove patch from the skin after at most 8 hours of application."

> **Directions** Adults and children 12 years of age and over:
> ■ Clean and dry affected area. ■ Remove film from patch and apply to the skin (see package for illustration)
> ■ Apply to affected area not more than 3 to 4 times daily ■ Remove patch from the skin after at most 8 hours application.
> Children under 12 years of age: consult a physician

17. However, the Product cannot adhere to the skin for eight hours, which renders the instructions to remove it "after at most 8 hours" misleading, because this assumes it will not have fallen off by then.

18. The result of the failure to adhere for eight hours means that the Product cannot deliver the "Maximum Strength" amount of lidocaine.

19. The representation that the Product can provide "temporary relief" of pain for eight hours is false and misleading given that it systematically fails to fully adhere to the bodies of users.

20. This is crucial because "[a]dequate adhesion is a critical quality attribute for topical

delivery systems; if the product lifts or detaches during wear, dosing may be compromised and there is an increased risk of inadvertent exposure to others."

## II. MAXIMUM STRENGTH CLAIMS

21. The representation that the Product is "Maximum Strength" is misleading because the actual strength of a lidocaine patch is measured by the "mass of drug relative to the mass of the adhesive per patch," delivered to the target area.

22. According to the FDA, when a patch delivering lidocaine becomes "partially detached," its efficacy of delivery and absorption of the active ingredient is greatly reduced.

23. The representation that it is "Maximum Strength" tells consumers it contains and delivers the maximum amount of lidocaine available in patch form and is superior, or at least equivalent, in efficacy and results to other OTC and prescription-strength lidocaine patches.

24. Numerous studies and reports revealed that users of the adhesive lidocaine patches seldom experience anything close to the promised hours of relief, because the patch fails to adhere for time period promised.

## III. DESENSITIZING CLAIMS

25. The claim that the Product provides "Numbing Relief" for a wearer's "Back, Neck, Shoulders, Elbows [and] Knees" is misleading because it implies it completely blocks and desensitizes nerves and pain receptors, eliminates responses to painful stimuli, and can treat neuropathic and musculoskeletal pain, including back and spinal pain.

26. The FDA determined that statements about "numbing" pain for external analgesic products are misleading to consumers because they are unable to perform this function through a transdermal patch.

27. The image of the outward radiating relief is inconsistent with the Product's limited

approval, disclosed in the Drug Facts to "temporarily relieve[s] minor pain."

**IV.     CONCLUSION**

28.     Defendant makes other representations and omissions with respect to the Product which are false and misleading.

29.     Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

30.     Had Plaintiff known the truth, he would not have bought the Product or would have paid less for it.

31.     As a result of the false and misleading representations, the Product is sold at a premium price, approximately no less than no less than $2.99 for two patches, excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

<u>Jurisdiction and Venue</u>

32.     Jurisdiction is pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

33.     The aggregate amount in controversy exceeds $5 million, including any statutory and punitive damages, exclusive of interest and costs.

34.     Plaintiff Shannon Hunt is a citizen of Chicago, Cook County, Illinois.

35.     Defendant Greenbrier International, Inc. is a Virginia corporation with a principal place of business in Chesapeake, Virginia, Chesapeake City County

36.     The members of the class Plaintiff seeks to represent are more than 100, because the Product has been sold with the representations described here for several years at thousands of Dollar Tree stores and/or the Dollar Tree website, in the States covered by Plaintiff's proposed

classes.

37. Venue is in the Eastern Division in this District because a substantial part of the events or omissions giving rise to these claims occurred in Cook County, including Plaintiff's purchase, transactions and/or use of the Product and awareness and/or experiences of and with the issues described here.

Parties

38. Plaintiff Shannon Hunt is a citizen of Chicago, Cook County, Illinois.

39. Defendant Greenbrier International, Inc. is a Virginia corporation with a principal place of business in Chesapeake, Virginia, Chesapeake City County

40. Defendant is a wholly-owned and controlled subsidiary of Dollar Tree Stores, Inc. ("Dollar Tree").

41. Dollar Tree is an American retail corporation that operates a chain of over 15,000 stores, selling everything from outdoor furniture to groceries.

42. Dollar Tree began as a Ben Franklin variety store in Norfolk, Virginia in 1953.

43. Over the years, its name and ownership would change but the fundamentals – essential and quality everyday items at fair prices – remained.

44. While Dollar Tree sells leading national brands, it also sells a large number of products under one of its private label brands, Assured.

45. Private label products are made by third-party manufacturers and sold under the name of the retailer, or its sub-brands.

46. Previously referred to as "generic" or "store brand," private label products have increased in quality, and often are superior to their national brand counterparts.

47. Products under the Assured brand have an industry-wide reputation for quality and

value.

48. In releasing products under the Assured brand, the foremost criteria was high-quality products that were equal to or better than the national brands.

49. Dollar Tree is able to get national brands to produce its private label items for Defendant due its loyal customer base and tough negotiating.

50. Private label products generate higher profits for retailers because national brands spend significantly more on marketing, contributing to their higher prices.

51. A survey by The Nielsen Co. "found nearly three out of four American consumers believe store brands are good alternatives to national brands, and more than 60 percent consider them to be just as good."

52. Private label products under the Assured brand benefit by their association with consumers' appreciation for the Dollar Tree brand as a whole.

53. Plaintiff purchased the Product at locations including Dollar Tree, 3539 W 26th St, Chicago, IL 60623, between September 2021 and April 2022, among other times.

54. Plaintiff believed and expected the Product provided maximum strength lidocaine in the percent indicated, to the areas referenced, and for the time period promised because that is what the representations and omissions on the front label said and implied.

55. Plaintiff saw the Product was labeled and marketed as "Maximum Strength" capable of delivering 4% lidocaine with directions to "Apply For 8 Hours."

56. Plaintiff relied on the words, terms coloring, descriptions, layout, placement, packaging, hang tags, and/or images on the Product, on the labeling, statements, omissions, claims, statements, and instructions, made by Defendant or at its directions, in digital, print and/or social media, which accompanied the Product and separately, through in-store, digital, audio, and print

marketing.

57. Plaintiff bought the Product at or exceeding the above-referenced price.

58. Plaintiff paid more for the Product than he would have had he known its representations were false and misleading, and had he known this, he would not have bought it or would have paid less.

59. Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, requirements, instructions, features, and/or components.

60. Plaintiff intends to, seeks to, and will purchase the Product again when he can do so with the assurance the Product's representations are consistent with its abilities, attributes, and/or composition.

61. Plaintiff is unable to rely on the labeling and representations not only of this Product, but other similar adhesive lidocaine patches, because he is unsure whether those representations are truthful.

## Class Allegations

62. Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **Illinois Class:** All persons in the State of Illinois who purchased the Product during the statutes of limitations for each cause of action alleged; and

> **Consumer Fraud Multi-State Class**: All persons in the States of Virginia, Montana, Wyoming, Idaho, Alaska, Kentucky, West Virginia, Kansas, Nebraska, North Dakota, Georgia, Iowa, Mississippi, Arkansas, South Carolina and Utah who purchased the Product during the statutes of limitations for each cause of action alleged.

63. Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled

to damages.

64. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

65. Plaintiff is an adequate representative because his interests do not conflict with other members.

66. No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

67. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

68. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

69. Plaintiff seeks class-wide injunctive relief because the practices continue.

Illinois Consumer Fraud and Deceptive Business Practices Act
("ICFA"), 815 ILCS 505/1, et seq.

70. Plaintiff incorporates by reference all preceding paragraphs.

71. Plaintiff believed the Product provided maximum strength lidocaine in the percent indicated to the areas referenced, and for the time period promised.

72. Defendant's false, misleading and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

73. Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

## Violation of State Consumer Fraud Acts

### (Consumer Fraud Multi-State Class)

74. The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the consumer protection statute invoked by Plaintiff and prohibit the use of unfair or deceptive business practices in the conduct of commerce.

75. The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

76. Defendant intended that members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct, which they did.

## Breaches of Express Warranty, Implied Warranty of Merchantability/Fitness for a Particular Purpose and Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.

77. The Product was manufactured, identified, marketed and sold by Defendant and expressly and impliedly warranted to Plaintiff that it provided maximum strength lidocaine in the percent indicated, to the areas referenced, and for the time period promised.

78. Defendant directly marketed the Product to Plaintiff through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, product descriptions distributed to resellers, and targeted digital advertising.

79. Defendant knew the product attributes that potential customers like Plaintiff were seeking and developed its marketing and labeling to directly meet those needs and desires.

80. Defendant's representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant that it provided maximum strength lidocaine in the percent indicated, to the areas referenced, and for the time period

10

promised.

81. Defendant's representations affirmed and promised that the Product provided maximum strength lidocaine in the percent indicated, to the areas referenced, and for the time period promised.

82. Defendant described the Product so Plaintiff believed it provided maximum strength lidocaine in the percent indicated, to the areas referenced, and for the time period promised, which became part of the basis of the bargain that it would conform to its affirmations and promises.

83. Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

84. This duty is based on Defendant's outsized role in the market for this type of Product, a trusted company known for its high quality products.

85. Plaintiff recently became aware of Defendant's breach of the Product's warranties.

86. Plaintiff provides or will provide notice to Defendant, its agents, representatives, retailers, and their employees that it breached the Product's express and implied warranties.

87. Defendant received notice and should have been aware of these issues due to complaints by third-parties, including regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

88. The Product did not conform to its affirmations of fact and promises due to Defendant's actions.

89. The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging, container or label, because it was marketed as if it provided maximum strength lidocaine in the percent indicated, to the areas referenced, and

11

for the time period promised.

90. The Product was not merchantable because Defendant had reason to know the particular purpose for which the Product was bought by Plaintiff, because he expected it provided maximum strength lidocaine in the percent indicated, to the areas referenced, and for the time period promised, and he relied on Defendant's skill and judgment to select or furnish such a suitable product.

91. Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Negligent Misrepresentation

92. Defendant had a duty to truthfully represent the Product, which it breached.

93. This duty was non-delegable, based on Defendant's position, holding itself out as having special knowledge and experience in this area, custodian of the Assured brand, the trusted and reliable store brand under the Dollar Tree banner.

94. Defendant's representations and omissions regarding the Product went beyond the specific representations on the packaging, as they incorporated the extra-labeling promises and commitments to quality, transparency and putting customers first, that it has been known for.

95. These promises were outside of the standard representations that other companies may make in a standard arms-length, retail context.

96. The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant.

97. Plaintiff reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, his purchase of the Product.

98. Plaintiff would not have purchased the Product or paid as much if the true facts had

been known, suffering damages.

## Fraud

99. Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it provided maximum strength lidocaine in the percent indicated, to the areas referenced, and for the time period promised.

100. Moreover, the records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of the falsity and deception, through statements and omissions.

## Unjust Enrichment

101. Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

## Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;
2. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;
3. Awarding statutory, punitive and/or other damages and interest;
4. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

5. Other and further relief as the Court deems just and proper.

Dated: September 3, 2022

Respectfully submitted,

/s/Spencer Sheehan
Sheehan & Associates, P.C.
60 Cuttermill Rd Ste 412
Great Neck NY 11021
(516) 268-7080
spencer@spencersheehan.com